J. Tyler Patterson *v.* John Dempsey, Governor, et al.

State ex rel. J. Tyler Patterson *v.* Raymond S. Thatcher, Comptroller, et al.

King, C. J., Murphy, Alcorn, Comley and Shannon, Js.

Argued January 7—decided February 25, 1965

*John J. Bracken,* with whom were *Leonard G. Tracy, George A. Saden* and, on the brief, *Morton C. Hansen, Jr.,* for the appellant (plaintiff).

*Louis Weinstein,* assistant attorney general, with whom was *Harold M. Mulvey,* attorney general, for the appellees (defendants).

KING, C. J. These two cases were tried together on stipulated facts, and in each a separate judgment for the defendants was rendered. Pursuant to a further stipulation, both appeals were consolidated and a single record covering both cases was printed. The first case, hereinafter called the Patterson case, is an action for a declaratory judgment and ancillary injunctive relief. The second case is a mandamus action and will hereinafter be referred to as such. The governor, the comptroller and the secretary of the state are the defendants in the Patterson case, and the comptroller and the secretary of the state are the defendants in the mandamus action.

I

The first important question raised in each case is the power of the governor to disapprove specific sections of a statute while approving the balance of that statute, or, in other words, the governor's right of partial veto.

The 1963 General Assembly enacted Special Act No. 386, entitled "An Act Making Appropriations for the Expenses of the State for the Fiscal Period Ending June 30, 1965." 31 Spec. Acts, pp. 395-451. The act contained itemized appropriations for the operation of all major divisions of the state government during the fiscal biennium from July 1, 1963, through June 30, 1965.

The special act was duly presented to the governor, and on June 28, 1963, he disapproved or vetoed

§§ 7, 10, 11 and 12,[1] and approved the remainder of the act. We take judicial notice of the fact that the regular session of the 1963 General Assembly adjourned on Wednesday, June 5, 1963. Thus, no effort was made to reconsider the disapproved sections and pass them over the executive veto. Sections 7, 10 and 11 are set out in footnotes 2, 3 and 4, respectively, and the veto message of the governor is set out in footnote 5.

Article fourth of the constitution of Connecticut treats of the executive department, and § 14 of that article contains the provisions conferring on the governor the power to disapprove or veto any bill which has been passed by both houses of the Gen-

---

[1] Section 12 admittedly became inoperative because of facts irrelevant to this litigation and consequently is not involved in either case. Therefore, only §§ 7, 10 and 11 will hereinafter be considered.

[2] "Sec. 7. All net earnings on investments of proceeds, accrued interest and premiums on the issuance, whether past or future, of bonds of the state applicable to the general fund accumulated as of June 30, 1963, June 30, 1964, and June 30, 1965, shall be applied respectively, after payment of expenses incurred in connection with the issuance of said bonds, on or before June 30, 1963, June 30, 1964, and June 30, 1965, to the debt service appropriation of the general fund or be deposited on or before said dates to the credit of the general fund as the applicable special acts prescribe."

[3] "Sec. 10. All resources of the Hartford (Charter Oak) Bridge Interest and Sinking Fund and the Groton-New London (Gold Star Memorial) Bridge Interest and Sinking Fund in excess of amounts required to pay in full the principal of and interest on outstanding bonded indebtedness of said funds and any unexpended balances in the flood fund shall be transferred to the highway fund as of June 30, 1963."

[4] "Sec. 11. Effective as of June 30, 1963, the comptroller is directed to record as revenue of the fiscal year ending on that date all revenues, including also recoveries, reimbursements and refunds, applicable to or arising out of operations of said fiscal year which are received or realized by the state agencies during the period of one month (July) after the close of the fiscal year. This same mode of accounting is to be carried out as of June 30, 1964, and June 30, 1965, with reference to revenues, as similarly defined, applicable to or arising out of operations of said fiscal years which

eral Assembly and has been properly presented to him. This section of the constitution, of course, confers no power to disapprove or veto any bill, whether or not an appropriation bill, except as an

are received or realized by the state agencies during the period of one month (July) after the close of said fiscal years."

[5] "John Dempsey                State of Connecticut
      Governor                     Executive Chambers
                                            Hartford

June 28, 1963

Honorable Ella T. Grasso
Secretary of State
State Capitol
Hartford, Connecticut

Dear Madam Secretary:

I return herewith House Bill No. 4623, Special Act No. 386, 'An Act Making Appropriations for the Expenses of the State for the Fiscal Period Ending June 30, 1965,' with my signature, disapproving, however, the items embodied in Sections 7, 10, 11 and 12.

Section 12, of course, is void because the substantive law to which it refers was not passed by the General Assembly.

Sections 7, 10, and 11, in the opinion of the Attorney General, are general legislation, and therefore violate Section 2-35 of the General Statutes, which governs General Assembly treatment of appropriation bills and provides that 'no general legislation shall be made a part of such appropriation bill.'

The Attorney General further advises that these sections are subject to the item veto power conferred upon the Governor by Article IV, Section 15 of the Constitution of the State of Connecticut.

These sections, by attempting to enact basic substantive changes in the methods of handling state financial accounts, would usurp functions and powers that properly belong to the executive or to elected constitutional officers.

All three sections would serve one purpose and one purpose only; the distortion of the true financial condition of the State through methods which do violence to sound budgetary procedures.

Sincerely,

JOHN   DEMPSEY
Governor"

entirety. *Bengzon* v. *Secretary of Justice,* 299 U.S. 410, 413, 57 S. Ct. 252, 81 L. Ed. 312; 42 Am. Jur., Public Funds, § 51, p. 753; 50 Am. Jur., Statutes, § 107, p. 108.

What is now § 15 of article fourth was, in November, 1924, adopted as article XXXVII of the constitution of Connecticut. General Statutes, Rev. 1930, p. 47. Section 15, the construction and application of which is crucial in each of these cases, reads as follows: "Sec. 15. The governor shall have power to disapprove of any item or items of any bill making appropriations of money embracing distinct items while at the same time approving the remainder of the bill, and the part or parts of the bill so approved shall become effective and the item or items of appropriations so disapproved shall not take effect unless the same are separately reconsidered and repassed in accordance with the rules and limitations prescribed for the passage of bills over the executive veto. In all cases in which the governor shall exercise the right of disapproval hereby conferred he shall append to the bill at the time of signing it a statement of the item or items disapproved, together with his reasons for such disapproval, and transmit the bill and such appended statement to the secretary. If the general assembly be then in session he shall forthwith cause a copy of such statement to be delivered to the house in which the bill originated for reconsideration of the disapproved items in conformity with the rules prescribed for legislative action in respect to bills which have received executive disapproval."

The governor's power of partial veto is only that conferred by the provisions of § 15 of article fourth of the constitution. *Bengzon* v. *Secretary of Justice,* supra. In other words, if the action of the governor

in disapproving §§ 7, 10 and 11 of the special act was legal, it could be so only because that action was authorized by § 15 of article fourth of the constitution.

When we turn to the special act it is obvious that it is a "bill making appropriations of money embracing distinct items" within the language of § 15 of article fourth. It is also clear that the portions of the bill vetoed by the governor are not sections which contain appropriations of money either in distinct items or in any other way. *Woodward* v. *Reynolds,* 58 Conn. 486, 490, 19 A. 511. "An item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill." *Bengzon* v. *Secretary of Justice,* supra, 414. "An item in an appropriation bill is an indivisible sum of money dedicated to a stated purpose." *Commonwealth* v. *Dodson,* 176 Va. 281, 296, 11 S.E.2d 120. Clearly, the vetoed sections constitute items of general legislation. Since obviously the bill is basically an appropriation bill, the three sections in question had no proper place in the bill, and their insertion was in violation of the provisions of § 2-35 of the General Statutes, the last two sentences of which read as follows: "Each appropriation bill shall specify the particular purpose for which appropriation is made and shall be itemized as far as practicable. No general legislation shall be made a part of such appropriation bill."

The defendants claim that since the inclusion in the special act of the three sections vetoed was in violation of the provisions of General Statutes § 2-35, it rendered the sections void. Although the special act was clearly an appropriation bill, § 2-35

could not effectively prevent the General Assembly from including §§ 7, 10 and 11 in the special act. "[O]ne legislature cannot control the exercise of the powers of a succeeding legislature." *Preveslin* v. *Derby & Ansonia Developing Co.*, 112 Conn. 129, 140, 151 A. 518; *State* v. *Staub*, 61 Conn. 553, 564, 23 A. 924. To the extent that the General Assembly failed to conform to the provisions of § 2-35, those provisions were rendered ineffective. It was not, strictly speaking, a case of an implied repeal of § 2-35, at least in the ordinary meaning of the term, since the subject matter of the three sections in question was neither inconsistent with nor repugnant to that of § 2-35. Rather, it was the action of the General Assembly, in inserting the three sections in the special act, which was inconsistent with and repugnant to §-2-35. That action was the equivalent of an affirmative enactment suspending, to the extent that the action violated § 2-35, the prohibitory part of § 2-35. *State* v. *Staub*, supra, 566. The effect is really that of repeal by implication. "When expressions of the legislative will are irreconcilable, the latest prevails." *Moran* v. *Bens*, 144 Conn. 27, 30, 127 A.2d 42. To hold otherwise would be to hold that one General Assembly could effectively control the enactment of legislation by a subsequent General Assembly. This obviously is not true, except where vested rights, protected by the constitution, have accrued under the earlier act.

We now come to the question whether, under the provisions of § 15 of article fourth of the constitution, the governor was empowered to disapprove, that is, to veto, the three sections in question which were not items of appropriation.

The power of partial veto conferred on the gov-

ernor by § 15 of article fourth can be exercised only with respect to "any bill making appropriations of money embracing distinct items." The special act did constitute such a bill since it clearly made, in most of the sections other than the three in question, "appropriations of money embracing distinct items." This is true even though, contrary to the provisions of General Statutes § 2-35, it also contained "general legislation", at least in the three sections vetoed.

Section 15 of article fourth further limits the partial veto power conferred on the governor to disapproval of "any item or items" of such a bill and further provides that the "item or items of appropriations so disapproved shall not take effect unless the same are separately reconsidered and repassed in accordance with the rules and limitations prescribed [under § 14 of article fourth] for the passage of bills over the executive veto."

The defendants' basic claim is that the words "item or items" of the bill mean "part or parts" of the bill, whether those parts do or do not constitute appropriations. In other words, they claim that "item or items" and "part or parts" are interchangeable phrases with the same meaning.[6] Since the three sections of the act obviously constituted parts of the act, the defendants argue that the governor had the power to veto the three sections in question.

This construction of the words "item or items" as meaning the same as "part or parts" is not a permissible one for several reasons. In the first place,

---

[6] Some support for this view may be found in *Commonwealth* v. *Barnett*, 199 Pa. 161, 173, 48 A. 976, a case decided at the turn of the century. We have neither found nor been referred to any other case giving any real support to this claim of the defendants.

like any other enactment, § 15 of article fourth must be construed as an entirety, giving effect, if possible, to each sentence, clause or phrase in such a manner that none is treated as insignificant and unnecessary. *State* v. *Springer,* 149 Conn. 244, 248, 178 A.2d 525; *McAdams* v. *Barbieri,* 143 Conn. 405, 419, 123 A.2d 182. The construction claimed by the defendants gives no effect to the phrase "item or items of appropriations so disapproved" which refers back to the earlier words "item or items."

Second, it is clear that the use of the words "part or parts of the bill so approved" is used in contradistinction to "item or items of appropriations so disapproved" because a bill might, as did this special act, even though contrary to the provisions of General Statutes § 2-35, contain matters of general legislation along with "appropriations of money embracing distinct items." The power of veto is limited to the "item or items of appropriations", but the approval of the balance of the bill might involve any part or parts of it whether they were, or were not, items of appropriation. Thus, in this particular special act, the governor could have vetoed any or all "items of appropriations" and approved the remainder of the bill which would have included the three sections of the bill in question. They would not be "items of appropriations", but they would be "parts of the bill" which the governor was empowered to approve.

Third, the obvious evil to which the 1924 constitutional amendment was directed was that of forcing the governor to accept items of appropriation, which from the standpoint of good government he felt should not be made, in order to preserve the bulk of an appropriations bill which he might feel largely consisted of proper items of appropriation

without which the government could not operate. This objective is attained under the foregoing construction.

Fourth, the fundamental reason why a partial disapproval or veto is not generally authorized, at least in the case of general legislation, is because of the separation of powers among the executive, legislative and judicial branches of the government. All affirmative legislative powers are given exclusively to the General Assembly. See cases such as *Booth* v. *Woodbury*, 32 Conn. 118, 126; *Beach* v. *Bradstreet*, 85 Conn. 344, 348, 82 A. 1030. If the governor were allowed to disapprove or veto parts of a bill involving general legislation, he could, in the case of many if not most such bills, by the exercise of that power, eliminate selected portions of a bill in such a manner as to change its meaning and thereby, in effect, enact an entirely different bill. This would usurp the legislative function, which is committed to the General Assembly alone. But such legislative action through the use of the veto power would be impossible if the veto power were restricted to distinct items of appropriation in a bill, whether that bill did, or did not, include other items of general legislation.

Protection against the inclusion of general legislation, such as the three sections in question, in an appropriation bill was not embodied in any constitutional prohibition, but in the quoted statutory provision of § 2-35. While this statutory provision should have been adequate to dissuade the General Assembly from the inclusion of general legislation in an appropriation bill, in this instance that proved not to be the case. And § 2-35 was, as already pointed out, necessarily inadequate to bridle the naked power of the General Assembly where, as

here, that body determined to include general legislation in an appropriation bill.

Owing to differences in the exact wording of generally similar constitutional provisions, it is probably impossible to find an authority which all would agree is directly in point and controlling. The defendants claim there is no authority precisely in point and that this case is one of first impression. Technically they are probably correct. Decisions from other jurisdictions involve constitutional provisions in varying degrees similar to our own § 15, but in no case identical with it.

Constitutional provisions conferring on the governor power to disapprove or veto a portion of a bill are, for the reason already pointed out, almost entirely limited to appropriation bills containing separate, distinct items of appropriation. Note, 35 A.L.R. 600. A collection of cases involving the power of the governor to veto a portion, only, of a bill may be found in an annotation in 35 A.L.R. 600, supplemented in 99 A.L.R. 1276. Some of the cases decided since the latter annotation are collected in the plaintiff's brief and are also discussed in the defendants' brief. Others may be found in the A.L.R. Bluebooks of Supplemental Decisions.

We conclude that the governor had no constitutional power to veto or disapprove any of the three sections in question and that his action in purporting so to do was unconstitutional and void.

## II

The defendants claim, in a special defense interposed in each case, that even if, as we have held, the governor had no power to veto the sections in question under the provisions of § 15 of article fourth of the constitution, the sections were in any event void

as unconstitutional because they were in conflict with the portion of § 23 of article fourth of the constitution of Connecticut providing that the defendant comptroller "shall prescribe the mode of keeping and rendering all public accounts." Section 23, in its entirety, reads as follows: "Sec. 23. The comptroller shall adjust and settle all public accounts and demands, except grants and orders of the general assembly. He shall prescribe the mode of keeping and rendering all public accounts. He shall, ex officio, be one of the auditors of the accounts of the treasurer. The general assembly may assign to him other duties in relation to his office, and to that of the treasurer, and shall prescribe the manner in which his duties shall be performed."

We first briefly discuss a subsidiary claim of the defendants. This claim is that the three sections are inconsistent with §§ 3-112 and 3-115 of the General Statutes, which concern the powers and duties of the comptroller and his preparation of financial statements. If, and to the extent that, the vetoed sections are inconsistent with, or repugnant to, either or both of the foregoing statutes, those statutes, for the reasons heretofore pointed out, cannot constitute an effective impediment to the enactment of the vetoed sections and are necessarily repealed by implication to the extent necessary to enable the sections of the special act to be operative.

Since the General Assembly has the power to enact any legislation except as restricted by provisions of the state or federal constitution, it follows that "in testing the constitutionality of an act of the legislature, we are not to assess it in the light of what we think of the wisdom and discernment of the lawmaking body in the particular

instance. Rather we are bound to approach the question from the standpoint of upholding the legislation as a valid enactment unless there is no reasonable ground upon which it can be sustained. . . . The burden of proving unconstitutionality rests on the . . . [person asserting it]." *Roan* v. *Connecticut Industrial Building Commission,* 150 Conn. 333, 338, 189 A.2d 399. A legislative enactment should not be held unconstitutional "unless its invalidity is . . . beyond reasonable doubt." *Beach* v. *Bradstreet,* 85 Conn. 344, 349, 82 A. 1030.

It is quite clear that the expressed intent of the portion of § 23 of article fourth material to this case was to give the comptroller the power to prescribe and determine "the mode of keeping and rendering all public accounts." But it went no further. It did not interfere with the ordinary right of the General Assembly to make appropriations and allocations, as such, of revenue and receivables. Once the appropriations or allocations had been made, however, the mode of accounting for them is committed to the comptroller and is beyond legislative interference or control. It may be difficult or even impossible to set forth a test which can be applied without controversy or question in every situation which conceivably might arise. But the fundamental distinction is present, and a legislative enactment of the type of the three sections in question can be held an unconstitutional infringement of the prerogatives of the comptroller under the foregoing portion of § 23 only when it is clear, beyond a reasonable doubt, that the enactment directly purports to require the comptroller to adopt a particular mode of keeping and rendering public accounts.

The provisions of § 23 of article fourth authoriz-

ing the General Assembly to assign the comptroller "other duties" clearly refer to matters other than the "mode of keeping and rendering . . . public accounts," and the plaintiff's claim that this portion of § 23 authorized the enactment of the three sections in question is without merit.

We turn now to the three sections in question. Sections 7 and 10 of the special act clearly are concerned with the application and allocation of receivables and excess sums in sinking funds. They do not purport to affect the comptroller's accounting practices except to the extent that any allocation of funds must be correctly reflected in any proper system of accounting. Since these two sections do not attempt to control the system of accounting reflecting the application and allocations as made, their enactment did not violate the quoted powers committed to the comptroller under § 23 of article fourth.

The defendants make an especial attack on § 11 of the special act in that they claim that it "directs the Comptroller to change the bookkeeping methods of the State . . . from what may be described as a cash basis generally, to an accrual basis insofar as money may become due from operations of the State for the fiscal periods ending June 30, 1963, 1964 and 1965." This, the defendants claim, the General Assembly is prohibited from doing by the quoted provisions of article fourth, § 23.

Clearly § 11 of the special act presents a very different problem from §§ 7 and 10. Section 11 purports to order the comptroller to record as revenue of the fiscal year ending on June 30, 1963, "all revenues . . . applicable to or arising out of operations" during that fiscal year "which are received or realized by the state agencies during the . . . month

[of] July after the close of the fiscal year." It further provides that "[t]his same mode of accounting is to be carried out as of June 30, 1964, and June 30, 1965".

That this section definitely and clearly goes beyond any mere allocation of revenues or receivables and does prescribe a "mode of keeping and rendering . . . public accounts" is too clear for argument. It is not susceptible of any separable construction such that any portion of it can be upheld as constituting a mere allocation of revenue or receivables, separate and distinct from portions purporting to prescribe a "mode of keeping and rendering . . . public accounts." See cases such as *Walsh* v. *Jenks,* 135 Conn. 210, 217, 62 A.2d 773. It follows that its invalidity as in violation of the provisions of § 23 of article fourth is beyond reasonable doubt. We therefore hold § 11, in its entirety, to be unconstitutional.

The governor has no power of partial veto over legislation merely because it is unconstitutional. Consequently his veto of § 11 was unauthorized and illegal. But because the section was unconstitutional, as claimed in the special defense, it is inoperative and is not a valid legislative enactment. In other words, it is null, void and wholly inoperative, not because of the veto, but because of its inherent unconstitutionality.

## III

There remains the question of the proper form of judgment to be rendered. It was stipulated as to each case that the defense of estoppel or unreasonable delay would not be interposed, and that the ascertainment of the facts essential for carrying out the provisions of the three sections in question can

be accomplished now as expeditiously and economically as would have been possible at any earlier date subsequent to July 31, 1963.

It was further stipulated that if the decision of this court is that the action of the governor was illegal, the judgment in each case should be for the plaintiff, in accordance with the respective prayers for relief in each case. This obviously cannot be done since the governor's action was illegal and inoperative as to §§ 7 and 10 of the special act and illegal but innocuous as to § 11, which was unconstitutional by its own inherent terms and therefore was itself inoperative and invalid.

Furthermore, as we understand the plaintiff's brief, he agrees that judgment should not run against the defendant secretary of the state in either case. In this respect, also, the judgment cannot conform to the foregoing stipulation. Counsel should have clarified these points before argument of the appeal.

There is error in part in both cases, the judgments are set aside and the cases are remanded with direction to render judgment in each case (1) in favor of the secretary of the state and (2) otherwise in conformity with the stipulation except to the extent that it must be modified to conform to this opinion.

In this opinion the other judges concurred.