350 Conn. 119        OCTOBER, 2024        119

Spillane *v.* Lamont

KEIRA SPILLANE ET AL. *v.* NED LAMONT ET AL.
(SC 20776)

Robinson, C. J., and D'Auria, Ecker, Alexander and Seeley, Js.

*Syllabus*

The defendants, state and municipal officials charged with oversight of public health and education, appealed from the trial court's denial of their motions to dismiss the plaintiff's action on sovereign immunity grounds. The plaintiffs sought injunctive relief and a judgment declaring that the public act (P.A. 21-6) that prospectively eliminated the religious exemption from the statutory (§ 10-204a) vaccination requirements for public and private school enrollment violated the plaintiffs' and their minor children's rights, under the federal and/or state constitution, to the free exercise of religion, equal protection and a free public education, as well as their rights under the statute (§ 52-571b) concerning religious freedom in Connecticut. The defendants claimed that the trial court had incorrectly concluded that the plaintiffs' constitutional challenges to P.A. 21-6 satisfied the substantial claim exception, and that their statutory free exercise of religion claim under § 52-571b satisfied the statutory waiver exception, to the doctrine of sovereign immunity. *Held*:

In ruling on a motion to dismiss based on a claim of sovereign immunity, the trial court must assess the legal sufficiency of a plaintiff's allegations to determine whether the plaintiff has asserted a substantial claim of a constitutional violation adequate to defeat the defense of sovereign immunity, but the court does not need to consider the merits of the constitutional claim in terms of its likelihood of success.

The plaintiffs' claims that P.A. 21-6 violates the free exercise of religion and equal protection provisions of the state and federal constitutions failed as a matter of law and, therefore, should have been dismissed on sovereign immunity grounds, as P.A. 21-6 is a neutral law of general applicability, and its repeal of the religious exemption was rationally related to the state's interest in protecting public health.

The plaintiffs' claim that P.A. 21-6 violates their right to a free public education under the state constitution (art. VIII, § 1) also failed as a matter of law and should have been dismissed on sovereign immunity grounds, as P.A. 21-6 was neither disciplinary nor infringed on the plaintiffs' right to access a substantially equal educational opportunity but, rather, merely imposed a reasonable vaccination requirement as a condition of enrolling in school, which reflected a rational exercise of legislative judgment that was reasonably related to the state's interest in preserving the health and safety of students.

Spillane *v.* Lamont

The trial court correctly concluded that the plaintiffs' statutory free exercise of religion claim under § 52-571b satisfied the statutory waiver exception to sovereign immunity, as the scope of the waiver afforded by that statute extends to free exercise challenges to the enforcement of legislation.

Neither the principle that one legislature may not bind the legislative authority of its successors nor the rule that legislative enactments are presumed to repeal earlier, inconsistent ones to the extent that they are irreconcilably in conflict was violated by applying § 52-571b to P.A. 21-6, as P.A. 21-6 did not expressly or implicitly conflict with § 52-571b.

Argued October 26, 2023—officially released July 30, 2024*

*Procedural History*

Action seeking a judgment declaring that a statute concerning mandatory school vaccinations is unconstitutional, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the action was withdrawn as against the defendant Whitby School; thereafter, the court, *Hon. Robert L. Genuario*, judge trial referee, denied the motions to dismiss filed by the named defendant et al., and the named defendant et al. appealed. *Reversed in part*; *further proceedings*.

*Darren P. Cunningham*, assistant attorney general, with whom were *Timothy J. Holzman*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellants (named defendant et al.).

*Lindy R. Urso*, for the appellees (plaintiffs).

*Opinion*

ALEXANDER, J. The sole issue in this appeal is whether the doctrine of sovereign immunity bars this declaratory judgment action challenging the legality of No. 21-6 of the 2021 Public Acts (P.A. 21-6). P.A. 21-6 prospectively eliminated the long-standing religious exemption from vaccination requirements as a condition of public and private school enrollment in General

---

* July 30, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Spillane *v.* Lamont

Statutes § 10-204a while maintaining the existing medical exemption. The plaintiffs, Keira Spillane and Anna Kehle, are parents of minor children who challenge the elimination of the religious exemption from the school vaccination requirement. They commenced the present action against the defendants, state and municipal officials charged with oversight of public health and education,[1] seeking injunctive relief and a declaration that P.A. 21-6 violates the constitutional rights of the plaintiffs and their children to the free exercise of religion, equal protection of the laws, and a free public education; see U.S. Const., amends. I and XIV; Conn. Const., art. I, §§ 1, 3 and 20;[2] Conn. Const., art. 8, § 1; and violates their rights under General Statutes § 52-571b. The trial court denied the defendants' motions to dismiss the complaint on the ground that they were immune from suit, concluding that two recognized exceptions to the doctrine of sovereign immunity—a "substantial claim" of a constitutional violation and a statutory waiver—had been satisfied. The defendants appealed from that decision to the Appellate Court, and we transferred the appeal to this court. See General Statutes § 51-199 (c); Practice Book § 65-1. We affirm in part and reverse in part the judgment of the trial court.

The plaintiffs allege the following facts, which are assumed to be true for purposes of this appeal. Each plaintiff has a minor child who maintains a religious exemption as a result of the legacy provision in P.A.

[1] The defendants are Governor Ned Lamont; Charlene M. Russell-Tucker, the commissioner of education; Manisha Juthani, the commissioner of public health; the Greenwich Board of Education; and the Orange Board of Education. Whitby School was also named as a defendant, but the action was withdrawn as to it.

[2] The operative complaint mistakenly alleges a violation of equal protection under article first, § 10, of the Connecticut constitution. We presume, as do the defendants, that the plaintiffs intended to allege a violation under article first, §§ 1 and 20. See *Ramos* v. *Vernon*, 254 Conn. 799, 826, 761 A.2d 705 (2000).

Spillane *v.* Lamont

21-6. See P.A. 21-6, § 1, codified at General Statutes (Supp. 2022) § 10-204a (b). Each plaintiff also has another minor child who was too young to have applied for the exemption before it was eliminated. The plaintiffs sincerely believe that mandatory inoculation violates their religious beliefs because, among other things, the vaccines are developed utilizing cell lines derived from aborted fetal tissue and the vaccines would "desecrate . . . their children's bodies by forever altering their innate immune systems."

A religious exemption from school vaccination requirements has existed since the enactment of § 10-204a in 1959. See Public Acts 1959, No. 588, §1. Connecticut schools have not had a substantial outbreak of any infectious disease for which a vaccine is mandated under § 10-204a for the past several decades.

At the time of the passage of P.A. 21-6, students enrolled in Connecticut public and private schools fell into one of the following four categories: fully compliant with the statutorily mandated vaccine schedule, not compliant with the vaccine schedule due to a medical exemption, not compliant with the vaccine schedule due to a religious exemption, and not compliant with the vaccine schedule, despite having neither a medical nor a religious exemption (secular noncompliance). Despite those who were noncompliant, Connecticut's statewide school vaccination rate was among the highest in the nation, well above the rate of 95 percent generally recommended by Centers for Disease Control and Prevention. Prior to the enactment of P.A. 21-6, the defendants had made little or no effort to increase statewide compliance rates or rates at those schools or districts that had vaccination rates substantially below statewide rates due to secular noncompliance. The defendants also failed to make any meaningful effort to employ means of increasing vaccination rates that

350 Conn. 119 OCTOBER, 2024 123

Spillane *v.* Lamont

were less restrictive than the elimination of the religious exemption.

In light of these facts and the decision to maintain the medical exemption while eliminating the religious exemption, the plaintiffs contend that P.A. 21-6 is part of a systematic effort to violate their religious rights. They commenced the present action against the defendants, seeking to enjoin the enforcement of P.A. 21-6 and a declaration that the act violates their rights under § 52-571b, the state constitution, and the federal constitution.

The defendants filed motions to dismiss the complaint on the basis of sovereign immunity. In support of their motions, the defendants submitted immunization data collected by the state Department of Public Health that indicated, inter alia, that the percentage of vaccinated kindergarten students for the 2019–2020 school year had decreased since the 2012–2013 school year, that the percentage of kindergarten students with religious exemptions from the vaccination requirements had increased over that same period, and that the percentage of those students with medical exemptions from the vaccination requirements had remained fairly constant since the 2012–2013 school year.[3] They also submitted opening statements from the legislative debates on the bill ultimately adopted as P.A. 21-6 by the legislation's sponsors, which cited the trends reflected in this data.

The trial court denied the motions to dismiss, agreeing with the plaintiffs that their claims satisfied an

[3] The 2019–2020 school year data for kindergarten students indicated that 2.3 percent of those students had a religious exemption from vaccination requirements (compared to a 2.2 percent national average for nonmedical vaccination exemptions), which reflected a 0.2 percent decrease from the prior school year but an increase of 0.9 percent since 2012–2013, and 0.2 percent of those students had a medical exemption from vaccination requirements, as compared with 0.3 percent during previous years.

exception to sovereign immunity. The court determined that the plaintiffs' statutory free exercise claim (count one) was not barred because § 52-571b includes an express waiver of immunity. It rejected the defendants' arguments that the statutory waiver did not extend to challenges to legislation and that § 52-571b could not bar operation of the subsequently enacted P.A. 21-6. The court concluded that there was "no reason to presume that the legislature did not believe that its enactment [of P.A.] 21-6 was consistent with the strict scrutiny standard of § 52-571b (b) . . . [or] intended to deprive persons who previously would have the right to challenge the validity of such actions in a judicial proceeding of their right to do so pursuant [to §] 52-571b (c)."

The trial court further determined that the plaintiffs' constitutional claims (counts two through six) were not barred because the complaint sought only equitable relief and alleged "substantial" constitutional claims. It rejected the defendants' argument that, in order for constitutional claims to be sufficiently substantial to overcome sovereign immunity, the complaint must allege facts that demonstrate that the plaintiffs are sufficiently likely to prevail on their constitutional claims under governing precedent. The court deemed this merits-type inquiry inappropriate for resolving the jurisdictional question raised by the defendants' motions to dismiss. It instead focused on the constitutional *nature* of the alleged incursion on the plaintiffs' rights, as well as the factual allegations in support of the claims, and deemed those allegations sufficiently substantial to overcome the defendants' sovereign immunity defense.

The defendants appealed from the denial of their motions to dismiss.[4] Their appeal, broadly character-

[4] Although the denial of a motion to dismiss is ordinarily an unappealable interlocutory ruling, it is immediately appealable when the motion is based on sovereign immunity because "the order or action so concludes the rights of the parties that further proceedings cannot affect them." (Internal quota-

Spillane *v.* Lamont

ized, asserts that the trial court's conclusions as to
the exceptions to sovereign immunity were contrary
to settled principles of law and rules governing the
construction of such exceptions.

We begin by setting forth certain fundamental princi-
ples that are not in dispute. "A motion to dismiss . . .
properly attacks the jurisdiction of the court, essentially
asserting that the plaintiff cannot as a matter of law
and fact state a cause of action that should be heard
by the court. . . . A motion to dismiss tests, inter alia,
whether, on the face of the record, the court is without
jurisdiction. . . . [O]ur review of the trial court's ulti-
mate legal conclusion and resulting [decision on] . . .
the motion to dismiss will be de novo." (Internal quota-
tion marks omitted.) *Columbia Air Services, Inc.* v.
*Dept. of Transportation*, 293 Conn. 342, 346–47, 977
A.2d 636 (2009).

"When a trial court decides a jurisdictional question
raised by a pretrial motion to dismiss on the basis of
the complaint alone, it must consider the allegations
of the complaint in their most favorable light. . . . In
this regard, a court must take the facts to be those
alleged in the complaint, including those facts necessar-
ily implied from the allegations, construing them in a
manner most favorable to the pleader." (Internal quota-
tion marks omitted.) *Conboy* v. *State*, 292 Conn. 642,
651, 974 A.2d 669 (2009). "In contrast, if the complaint
is supplemented by undisputed facts established by affi-
davits submitted in support of the motion to dismiss
. . . other types of undisputed evidence . . . and/or
public records of which judicial notice may be taken
. . . the trial court, in determining the jurisdictional
issue, may consider these supplementary undisputed
facts and need not conclusively presume the validity

tion marks omitted.) *Caverly* v. *State*, 342 Conn. 226, 232 n.5, 269 A.3d
94 (2022).

Spillane *v.* Lamont

of the allegations of the complaint. . . . Rather, those allegations are tempered by the light shed on them by the [supplementary undisputed facts]. . . . If affidavits and/or other evidence submitted in support of a defendant's motion to dismiss conclusively establish that jurisdiction is lacking, and the plaintiff fails to undermine this conclusion with counteraffidavits . . . or other evidence, the trial court may dismiss the action without further proceedings. . . . If, however, the defendant submits either no proof to rebut the plaintiff's jurisdictional allegations . . . or only evidence that fails to call those allegations into question . . . the plaintiff need not supply counteraffidavits or other evidence to support the complaint, but may rest on the jurisdictional allegations therein.'' (Emphasis omitted; internal quotation marks omitted.) *Cuozzo* v. *Orange*, 315 Conn. 606, 615–16, 109 A.3d 903 (2015).

''[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss.'' (Internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, supra, 293 Conn. 347. ''The principle that the state cannot be sued without its consent . . . has deep roots in this state and our legal system in general, finding its origin in ancient common law.'' (Internal quotation marks omitted.) *DaimlerChrysler Corp.* v. *Law*, 284 Conn. 701, 711, 937 A.2d 675 (2007). The doctrine ''rests on the principle and on the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property.'' (Internal quotation marks omitted.) *Hicks* v. *State*, 297 Conn. 798, 807, 1 A.3d 39 (2010).

''[I]n its pristine form the doctrine of sovereign immunity would exempt the state from suit entirely . . . because the sovereign could not be sued in its own

Spillane *v.* Lamont

courts and there can be no legal right as against the authority that makes the law on which the right depends. . . . This absolute bar of actions against the state [however] has been greatly modified both by statutes effectively consenting to suit in some instances as well as by judicial decisions in others. . . . For example, we have held that the doctrine . . . does not prevent a claimant from seeking declaratory or injunctive relief for allegations that a state official is acting either pursuant to an unconstitutional statute or in excess of his authority. . . . This is so because individuals have an important interest in being protected from improper governmental action and the state has no interest in allowing such activity to continue such that a court's action to curb that activity would interfere with the state's legitimate governmental functions.'' (Citations omitted; internal quotation marks omitted.) *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 80, 74 A.3d 1242 (2013); see id., 80–81 (explaining distinction drawn by this court between certain actions seeking equitable relief and those seeking damages); *Doe* v. *Heintz*, 204 Conn. 17, 31, 526 A.2d 1318 (1987) (acknowledging judicial decisions holding that bar to suit must be relaxed when state or its proxy engages in unconstitutional acts).

Our case law has identified three recognized exceptions to sovereign immunity: ''(1) when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity . . . (2) when an action seeks declaratory or injunctive relief on the basis of a substantial claim that the state or one of its officers has violated the plaintiff's constitutional rights . . . and (3) when an action seeks declaratory or injunctive relief on the basis of a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the officer's statutory authority.'' (Citations omitted; internal quotation marks omitted.) *Columbia*

Spillane *v.* Lamont

*Air Services*, *Inc.* v. *Dept. of Transportation*, supra, 293 Conn. 349. The plaintiffs in the present case rely on the first and second of these exceptions.

I

We begin with the substantial claim exception, which determines whether the trial court has jurisdiction over the constitutional violations alleged in counts two through six of the complaint.[5] The defendants contend that the trial court incorrectly relied solely on the constitutional nature of the plaintiffs' claims and the supporting factual allegations to determine that these claims are "substantial.'' They assert that, in *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 23 A.3d 668 (2011), this court made clear that the trial court was required to consider the merits of those claims in determining whether the allegations and the undisputed evidence were sufficient to establish the violation of a constitutional right *as a matter of law*. According to the defendants, without a threshold judicial determination of legal sufficiency, state officials would lose the benefit of their immunity from suit and be exposed to burdensome discovery for alleged constitutional claims that have no reasonable possibility of succeeding. They further contend that, if the trial court had applied the correct standard in the present case, it would have been compelled to grant their motions to dismiss because the plaintiffs' constitutional claims are foreclosed as a matter of law and fact.

For the reasons set forth hereinafter, we agree with the defendants that, in ruling on a motion to dismiss based on a claim of sovereign immunity, our case law requires the trial court to assess the legal sufficiency of the allegations of a complaint to determine whether

_____

[5] The complaint also contained a seventh count, which sought a preliminary injunction on the basis of the constitutional violations alleged in the other counts.

Spillane *v.* Lamont

the plaintiff has asserted a substantial claim of a constitutional violation adequate to defeat the defense of sovereign immunity. Applying this standard to the plaintiffs' constitutional claims, we conclude that those claims are foreclosed as a matter of law and fact and, therefore, that they are barred by sovereign immunity.

A

In *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977), this court confirmed the three recognized exceptions to sovereign immunity and endorsed the "substantial claim" standard proposed by Professor J. Randolph Block to guide their application. Id., 624–25; see also J. Block, "Suits Against Government Officers and the Sovereign Immunity Doctrine," 59 Harv. L. Rev. 1060, 1081 (1946) ("[when] no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction"). Block had suggested that this standard would strike the proper balance between legitimate competing interests because, "[i]n those cases in which it is alleged that the defendant officer is proceeding under an unconstitutional statute or in excess of his statutory authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine. Moreover, the government cannot justifiably claim interference with its functions when the acts complained of are unconstitutional or unauthorized by statute. On the other hand, [when] no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction." (Internal quotation marks omitted.) *Horton* v. *Meskill,*

supra, 624, quoting J. Block, supra, 59 Harv. L. Rev. 1080–81.

We have stated that, "[f]or a claim made pursuant to the second exception, complaining of unconstitutional acts, we require that [t]he allegations of such a complaint and the factual underpinnings if placed in issue, must clearly demonstrate an incursion [on] constitutionally protected interests. . . . In the absence of a proper factual basis in the complaint to support the applicability of [any of the three] exceptions, the granting of a motion to dismiss on sovereign immunity grounds is proper." (Citations omitted; internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, supra, 293 Conn. 350.

Prior to today, fourteen appellate cases have considered a motion to dismiss based on sovereign immunity in which the plaintiff claimed that the substantial claim exception had been met. In all of them, the court determined that the trial court should have granted the motion to dismiss because the complaint, as supplemented by the undisputed facts, demonstrated that the plaintiffs could not as a matter of law and fact state a cause of action. In each such case, the court reached its determination by assessing the facts alleged in the complaint (or established by uncontroverted evidence submitted in connection with the motion to dismiss) in light of case law establishing the elements required to prevail on the constitutional claim. See, e.g., *Markley* v. *Dept. of Public Utility Control*, supra, 301 Conn. 71–72 (allegations were insufficient to establish equal protection violation); *Gold* v. *Rowland*, 296 Conn. 186, 203–205, 994 A.2d 106 (2010) (allegations were insufficient to support claim of unconstitutional taking); *Columbia Air Services, Inc.* v. *Dept. of Transportation*, supra, 293 Conn. 358–63 (allegations were insufficient to estab-

350 Conn. 119        OCTOBER, 2024        131

Spillane *v.* Lamont

lish deprivation of procedural due process and equal protection of law).[6]

In *Markley*, this court appeared to equate a "substantial" constitutional claim with a claim supported by allegations that demonstrate a "sufficient likelihood of succeeding . . . ." *Markley* v. *Dept. of Public Utility Control*, supra, 301 Conn. 71–72; see id. ("we conclude that, to the extent that the plaintiff has preserved his equal protection challenges, he has failed to demonstrate a sufficient likelihood of succeeding on those claims to overcome the defendants' sovereign immunity"). Likelihood of success on the merits is a familiar element of proof when a plaintiff seeks a temporary injunction; see, e.g., *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 457, 493

---

[6] See also *184 Windsor Avenue, LLC* v. *State*, 274 Conn. 302, 319–20, 875 A.2d 498 (2005) (allegations were insufficient to support finding that plaintiff had enforceable property interest); *Tamm* v. *Burns*, 222 Conn. 280, 288–89, 610 A.2d 590 (1992) (allegations were insufficient to support claim of unconstitutional taking by way of inverse condemnation); *Barde* v. *Board of Trustees*, 207 Conn. 59, 65–66, 539 A.2d 1000 (1988) (allegations were insufficient to establish equal protection claim); *Upson* v. *State*, 190 Conn. 622, 625–26, 461 A.2d 991 (1983) (allegations were insufficient to demonstrate unconstitutional taking when condemnation agreements appended to complaint reflected that plaintiff had agreed to value given as full compensation); *Horak* v. *State*, 171 Conn. 257, 261–62, 368 A.2d 155 (1976) (allegations were insufficient to establish unconstitutional taking); *Jan G.* v. *Semple*, 202 Conn. App. 202, 215, 223, 244 A.3d 644 (allegations were insufficient to demonstrate incursion on constitutionally protected interests), cert. denied, 336 Conn. 937, 249 A.3d 38, cert. denied,        U.S.        , 142 S. Ct. 205, 211 L. Ed. 2d 88 (2021); *Braham* v. *Newbould*, 160 Conn. App. 294, 305–306, 124 A.3d 977 (2015) (under established precedent, allegations were insufficient to support claim of violation of eighth amendment to United States constitution); *Traylor* v. *Gerratana*, 148 Conn. App. 605, 611–12, 88 A.3d 552 (conclusory allegations were insufficient to demonstrate violation of constitutional rights to equal access to court, separation of powers, equal protection, due process, and trial by jury), cert. denied, 312 Conn. 901, 91 A.3d 908, and cert. denied 312 Conn. 902, 112 A.3d 778, cert. denied, 574 U.S. 978, 135 S. Ct. 444, 190 L. Ed. 2d 336 (2014); *Page* v. *State Marshall Commission*, 108 Conn. App. 668, 676–79, 950 A.2d 529 (allegations were insufficient to demonstrate unconstitutional taking and violation of due process rights), cert. denied, 289 Conn. 921, 958 A.2d 152 (2008).

Spillane *v.* Lamont

A.2d 229 (1985); but this court had never previously used this standard as a proxy for a substantial constitutional claim. The only authority cited in *Markley* in connection with this language was *Gold* v. *Rowland*, supra, 296 Conn. 200–201. *Markley* v. *Dept. of Public Utility Control*, supra, 71–72. However, *Gold*, which involved an unconstitutional taking claim, did not apply a sufficient likelihood of success standard in deciding the motion to dismiss but, rather, in accordance with prior precedent, stated that, "to survive the defense of sovereign immunity, [the complaint] must allege sufficient facts to support a finding of a taking of [property] in a constitutional sense . . . ." (Internal quotation marks omitted.) *Gold* v. *Rowland*, supra, 201. To the extent that *Markley* suggests that the court must also consider the merits of the constitutional claim in terms of its likelihood of success, we disavow any such implication.

Accordingly, in considering the defendants' motions to dismiss in the present case, we must determine only whether the allegations set forth in the complaint, as supplemented by the undisputed facts, demonstrate that the plaintiffs cannot as a matter of law and fact state a cause of action that may be heard by the court.

B

Whether the plaintiffs' complaint alleges constitutional claims sufficient to withstand the defendants' motions to dismiss depends on the legal requirements for each claim and the facts necessary to meet those requirements. The plaintiffs' complaint alleges violations of the right to the free exercise of religion and the right to equal protection of the law under both the state and the federal constitutions. The plaintiffs' appellate brief treats those parallel provisions of the Connecticut constitution as being governed by the same legal principles and standards as those governing their

Spillane *v.* Lamont

federal constitutional claims. Their additional claim, pertaining to the right to a free public education, arises exclusively under the Connecticut constitution.

1

Free Exercise Claim

In support of their claim that the plaintiffs' free exercise claim is foreclosed as a matter of law, the defendants point to a recent federal decision that rejected a nearly identical constitutional challenge to P.A. 21-6. See *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, 579 F. Supp. 3d 290, 302–306, 311–13 (D. Conn. 2022) (despite having previously accommodated religious objections to vaccination by providing mechanism for objectors to obtain exemptions, state may repeal religious exemptions without offending free exercise or equal protection clauses), vacated in part on other grounds, 76 F.4th 130 (2d Cir. 2023), cert. denied, U.S. , 144 S. Ct. 2682, L. Ed. 2d (2024). While the present appeal was pending, the United States Court of Appeals for the Second Circuit affirmed the District Court's resolution of the free exercise claim in *We the Patriots USA, Inc.*, citing, among other reasons, the "nearly unanimous consensus" of other courts rejecting claims of a constitutional defect in a state's school vaccination mandate on account of the absence or repeal of a religious exemption. *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 136. The United States Supreme Court subsequently denied the plaintiffs' petition for a writ of certiorari in that case. See *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 144 S. Ct. 2682. We agree with the Second Circuit's analysis of the free exercise claim and adopt it as our own as it pertains to the plaintiffs' arguments in the present case.[7]

---

[7] This court gives decisions of the Second Circuit "particularly persuasive weight in the resolution of issues of federal law . . . ." (Internal quotation marks omitted.) *St. Juste* v. *Commissioner of Correction*, 328 Conn. 198,

Spillane *v.* Lamont

In *Employment Division, Dept. of Human Resources* v. *Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), the United States Supreme Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." (Internal quotation marks omitted.) Id., 879. Under *Smith*, "generally applicable, [religion neutral] laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest . . . ." Id., 886 n.3. "When a religiously neutral and generally applicable law incidentally burdens free exercise rights, [courts] will sustain the law against constitutional challenge if it is rationally related to a legitimate governmental interest." *Does 1-6* v. *Mills*, 16 F.4th 20, 29 (1st Cir. 2021), cert. denied sub nom. *Does 1-3* v. *Mills*, U.S. , 142 S. Ct. 1112, 212 L. Ed. 2d 9 (2022); see id., 29–30, 37 (upholding denial of preliminary injunction because petitioners were unlikely to succeed on merits of their claim that Maine's mandatory vaccination law for health-care workers, which did not offer a religious exemption, violated free exercise clause).

A law is not neutral if the government "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton* v. *Philadelphia*, 593 U.S. 522, 533, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021). This occurs when a law either "refers to a religious practice" or is facially neutral but "targets religious conduct for distinctive treatment . . . ."

210, 177 A.3d 1144 (2018); see also *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 475 n.11, 881 A.2d 259 (2005) ("[d]eparture from Second Circuit precedent on issues of federal law . . . should be constrained in order to prevent the plaintiff's decision to file an action in federal District Court rather than a state court located a few blocks away from having the bizarre consequence of being outcome determinative" (internal quotation marks omitted)).

Spillane *v.* Lamont

*Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U.S. 520, 533, 534, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993). "To fail the neutrality prong, it is not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion. See, e.g., [*Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Commission*, 584 U.S. 617, 638, 138 S. Ct. 1719, 201 L. Ed. 2d 35 (2018)]. The [United States] Supreme Court has stressed, however, that even 'subtle departures from neutrality' violate the [f]ree [e]xercise [c]lause, and thus 'upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the [c]onstitution and to the rights it secures.' [Id., 638–39] . . . . To determine whether the government has acted neutrally, courts look to factors such as the background of the challenged decision, the sequence of events leading to its enactment, and the legislative or administrative history." (Emphasis in original.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 145.

"A law is not generally applicable if it invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." (Internal quotation marks omitted.) *Fulton* v. *Philadelphia*, supra, 593 U.S. 533; see id., 534–35 (ordinance not generally applicable because exemptions from nondiscrimination provision made at " 'sole discretion' " of city official). A law is also not generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Id., 534. This principle, that a government may not be substantially underinclusive in pursuit of its legitimate interests, prohibits the state from "impos[ing] burdens only on conduct motivated by religious belief . . . ."

Spillane *v.* Lamont

*Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, supra, 508 U.S. 543; see id. ("The ordinances . . . fail to prohibit nonreligious conduct that endangers these interests in a similar or greater degree than [religious conduct] does. The underinclusion is substantial, not inconsequential. Despite the city's proffered interest in preventing cruelty to animals, the ordinances are drafted with care to forbid few killings but those occasioned by religious sacrifice.").

The United States Supreme Court, in applying these principles to state limitations on private religious gatherings during the COVID-19 pandemic, clarified the proper general applicability analysis. Relevant here, the court explained that government regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the [f]ree [e]xercise [c]lause, whenever they treat *any* comparable secular activity more favorably than religious exercise." (Emphasis in original.) *Tandon* v. *Newsom*, 593 U.S. 61, 62, 141 S. Ct. 1294, 209 L. Ed. 2d 355 (2021). Further, "whether two activities are comparable for purposes of the [f]ree [e]xercise [c]lause must be judged against the asserted government interest that justifies the regulation at issue . . . [and] not the reasons why people gather." (Citation omitted.) Id.

We first consider whether P.A. 21-6 is neutral toward religion.[8] In undertaking the identical inquiry, the Second Circuit, in *We the Patriots USA, Inc.*, concluded that P.A. 21-6 satisfies *Smith*'s neutrality prong because (1) it is facially neutral, and (2) the legislative history surrounding it is devoid of evidence that the act was

[8] We take judicial notice of the legislative history surrounding P.A. 21-6. See, e.g., *State* v. *Santiago*, 318 Conn. 1, 126, 122 A.3d 1 (2015) ("legislative history . . . [is] properly subject to judicial notice"). We note further that the specific data on which we rely—and on which the Second Circuit in *We the Patriots USA, Inc.*, relied—are part of the record in this case in addition to being part of the legislative history.

Spillane *v.* Lamont

motivated by "hostility to religious believers, even when read with an eye toward 'subtle departures from neutrality' or 'slight suspicion' of 'animosity to religion or distrust of its practices.' " *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 148, quoting *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Commission*, supra, 584 U.S. 638–39. The court observed that, "[f]ar from expressing hostility, legislators accommodated religious objectors to an extent the legislators believed would not seriously undermine the [a]ct's goals." *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 148. They did this in a number of ways that included, but was not limited to, a legacy provision allowing students in kindergarten through twelfth grade to keep their religious exemptions, even if they moved to another school district. Id.

In reaching its determination, the Second Circuit rejected the plaintiffs' argument that "[P.A. 21-6] is not neutral under *Smith* [because] . . . repealing any existing religious exemption is hostile to religion per se." Id., 149. The plaintiffs in the present case make the same argument, asserting that "there is little doubt that P.A. 21-6 is not neutral on its face, as the entire purpose of the law was to eliminate the school vaccine religious exemption, which has existed for as long as the vaccine requirement itself."[9] (Emphasis omitted.) In rejecting

---

[9] The plaintiffs argue that dismissal of their constitutional claims is premature in the absence of discovery, which they argue "is needed to uncover the defendants' motives, animus, and [to] obtain evidence regarding the lack of neutrality." When asked during oral argument before this court what information could be obtained through discovery that is not already part of the record or legislative history, the plaintiffs' counsel responded that, to prevail, they needed additional data to demonstrate that eliminating the religious exemption was the most restrictive means for addressing the governmental concerns behind P.A. 21-6, not the least restrictive means. Contrary to those assertions, however, school data concerning vaccination compliance rates are part of the legislative history and were submitted in support of the defendants' motions to dismiss. More important, however, as counsel acknowledged at oral argument, this information is relevant only

Spillane *v.* Lamont

this argument, the Second Circuit reasoned: "[The United States] Supreme Court has used a consistent cluster of terms to describe the kind of official attitude that violates the neutrality prong of *Smith*—'hostility,' 'animosity,' 'distrust,' 'a negative normative evaluation.' . . . These terms denote a subjective state of mind on a government actor's part, not the mere fact that government action has affected religious practice. . . . [T]he legislative record simply reveals no evidence of any such animus." (Citation omitted.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 149. The court noted that, to the extent that P.A. 21-6 mentions religion, it is only to provide legacy exemptions *benefiting* religious believers. Id.

The Second Circuit further reasoned: "[The United States] Supreme Court has long described religious exemptions as part of a mutually beneficial 'play in the joints' between the [e]stablishment [c]lause and [the] [f]ree [e]xercise [c]lause. [*Walz* v. *Tax Commission*], 397 U.S. 664, 669, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). As with many of the other exemptions that benefit individuals and communities of faith—not requiring religious organizations to pay income and property tax, for instance—the government may constitutionally elect to accommodate religious believers but is not constitutionally *required* to do so. See, e.g., *Carson* v. *Makin*, [596 U.S. 767, 785, 142 S. Ct. 1987], 213 L. Ed. 2d 286 (2022) (holding [that] [s]tates need not subsidize private education, including private religious schools, but must make any subsidies equally available to religious and nonreligious schools). [The plaintiffs'] argument, which would make every exemption permanent once granted, threatens to distort the relationship between the [c]lauses." (Emphasis in original). *We the Patriots USA,*

insofar as it may be proof that P.A. 21-6 is not narrowly tailored to the government's stated interest. Whether the law is narrowly tailored is relevant only if we conclude that P.A. 21-6 is subject to strict scrutiny under *Smith*.

Spillane *v.* Lamont

*Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 150.

In coming to this conclusion, the Second Circuit relied on *Yellowbear* v. *Lampert*, 741 F.3d 48 (10th Cir. 2014), in which the United States Court of Appeals for the Tenth Circuit explained that "the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches [that] the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price." Id., 58. Following the Tenth Circuit's reasoning, the Second Circuit observed that "adopting [the] plaintiffs' rule would disincentivize [s]tates from accommodating religious practice in the first place. . . . Few reasonable legislators or other government actors would be willing to tie the hands of generations of their successors by enacting accommodations that could not be repealed or changed if they no longer served the public good." (Citation omitted.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 150. We agree with the Second Circuit's analysis of this issue and similarly conclude that P.A. 21-6 is neutral toward religious exercise.

Having determined that P.A. 21-6 satisfies *Smith*'s neutrality prong, we now consider whether the act is generally applicable. The Second Circuit, in deciding this question, concluded that P.A. 21-6 was generally applicable because it "does not provide 'a mechanism for individualized exemptions,' meaning that it does not give government officials discretion to decide whether a particular individual's reasons for requesting exemption are meritorious"; id.; and because it is not underinclusive, that is, it does not prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. Id., 151. With respect to individualized exemptions, the court noted

Spillane *v.* Lamont

that the medical exemptions provided under P.A. 21-6 are not discretionary but are "instead mandatory and framed in objective terms . . . ." Id., 150.

In reaching its determination, the Second Circuit rejected the plaintiffs' argument that P.A. 21-6's "requirement that specified documents supporting requests for medical exemptions be acknowledged by . . . state and local officials affords such officials the discretion to approve or deny exemptions on a case-by-case basis." Id., 151. The plaintiffs in the present case make a similar argument that the act provides a mechanism for individualized medical exemptions because the state "retains the sole discretion" to decide whether to accept a provider's statement that a vaccine is contraindicated. Although the plaintiffs analogize this case to *Fulton*, in which the "entirely discretionary exceptions in [that case] render[ed] the . . . [nondiscrimination] requirement not generally applicable"; *Fulton* v. *Philadelphia*, supra, 593 U.S. 536; nothing about the mandatory language in P.A. 21-6 provides any discretion in granting medical exemptions. Instead, P.A. 21-6 mandates that "[a]ny such child who . . . presents a certificate, in a form prescribed by the commissioner pursuant to section 7 of this act,[10] from a physician, physician assistant or

[10] Section 7 of P.A. 21-6 provides in relevant part: [T]he Commissioner of Public Health shall develop and make available . . . a certificate for use by a [medical provider] . . . stating that, in the opinion of such [provider] . . . a vaccination required by the general statutes is medically contraindicated for a person because of the physical condition of such person. The certificate shall include (1) definitions of the terms 'contraindication' and 'precaution,' (2) a list of contraindications and precautions recognized by the National Centers for Disease Control and Prevention for each of the statutorily required vaccinations, from which the [provider] . . . may select the relevant contraindication or precaution on behalf of such person, (3) a section in which the [provider] . . . may record a contraindication or precaution that is not recognized by the National Centers for Disease Control and Prevention, but in his or her discretion, results in the vaccination being medically contraindicated . . . (4) a section in which the [provider] . . . may include a written explanation for the exemption from any statutorily required vaccinations, (5) a section requiring the signature of the [provider] . . . (6) a requirement that the [provider] . . . attach such person's most

Spillane *v.* Lamont

advanced practice registered nurse stating that in the opinion of such [medical provider] . . . such immunization is medically contraindicated because of the physical condition of such child . . . *shall be exempt* from the appropriate provisions of this section.'' (Emphasis added; footnote added.) P.A. 21-6, § 1, codified at General Statutes (Supp. 2022) § 10 (a) (a). As the Second Circuit explained: ''[T]hese elements of the [a]ct's medical exemption regime do not allow the government to decide which reasons for not complying with the [vaccine] policy are worthy of solicitude.'' (Internal quotation marks omitted.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development,* supra, 76 F.4th 151.

As for whether P.A. 21-6 is underinclusive, we conclude that it is not because it does not regulate religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it. As the Second Circuit explained: ''[W]hether two activities are comparable for purposes of the [f]ree [e]xercise [c]lause must be judged against the asserted government interest that justifies the regulation at issue,'' which, in the present case, is the state's interest in ''[protecting] the health and safety of Connecticut students and the broader public . . . .'' (Internal quotation marks omitted.) Id.

In determining that P.A. 21-6 was not underinclusive, the Second Circuit rejected the plaintiffs' argument that, ''because unvaccinated children are [all] at heightened risk of developing and transmitting [vaccine preventable] illnesses, regardless of their reason for not being vaccinated, medical and religious exemptions are comparable, and, under [established precedent], the [s]tate may not prefer a medical reason over a religious one

current immunization record, and (7) a synopsis of the grounds for any order of quarantine or isolation . . . .''

Spillane *v.* Lamont

when the medical reason undermines the government's asserted interests in a similar way.'' (Internal quotation marks omitted.) Id., 153. The plaintiffs in the present case make the same argument, that ''P.A. 21-6 is not generally applicable . . . [because] it provides for medical exemptions while removing religious exemptions.'' We agree with the Second Circuit that the plaintiffs' argument ''is based on a misunderstanding of the [s]tate's interest in mandating vaccination in schools . . . . Allowing students for whom vaccination is medically contraindicated to avoid vaccination while requiring students with religious objections to be vaccinated does, in both instances, advance the [s]tate's interest in promoting health and safety. To the contrary, exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the [s]tate's interest.''[11] (Cita-

_____

[11] The plaintiffs argue that the legislature's actual interest in passing P.A. 21-6—as opposed to its stated interest (protecting student and public health and safety), which the plaintiffs claim is intentionally cast in overly generalized terms to avoid the problem of underinclusion—is to increase vaccination rates in order to decrease the likelihood of a measles outbreak. They contend that ''allowing any other category of student . . . to remain unvaccinated, such as students with grandfathered religious exemptions . . . preschool students with religious exemptions who were given a one-year grace period [to get vaccinated] . . . and students who are not in compliance with the vaccination requirements but do not have any exemption''; (citations omitted); renders the act underinclusive in light of what they contend is its actual purpose (decreasing the likelihood of a measles outbreak). We are not persuaded. Even if we were to accept the plaintiffs' narrow view of the legislature's interest in enacting P.A. 21-6; but see *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 151–53 (rejecting narrow view in light of legislative history); we disagree that the legacy provision or the existence of noncompliant students renders the act underinclusive. Far from penalizing religious conduct, the legacy provision *privileges* that conduct by allowing students in kindergarten and beyond who already have religious exemptions to keep them, and by providing preschool students with preexisting religious exemptions a one year grace period in which to get vaccinated.

The medical exemption also does not render P.A. 21-6 substantially underinclusive because medical and religious exemptions are not comparable for

Spillane *v.* Lamont

tion omitted.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 153.

The Second Circuit continued: "[P.A. 21-6] promotes the health and safety of vaccinated students by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring [vaccine preventable] diseases) in school . . . [while simultaneously] promot[ing] the health and safety of unvaccinated students. Not only does the absence of a religious exemption decrease the risk that unvaccinated students will acquire a [vaccine preventable] disease by lowering the number of unvaccinated peers they will encounter at school, but the medical exemption also allows the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict

purposes of the free exercise analysis. See *Tandon* v. *Newsom*, supra, 593 U.S. 62 ("[c]omparability is concerned with the risks the various activities pose"). The data included in this record demonstrate that "more than ten times as many students had religious exemptions than medical exemptions." *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 155. Both the medical and religious exemptions, therefore, even when considered "against the [more narrowly cast] government interest," pose vastly different risks. *Tandon* v. *Newsom*, supra, 62; see also *We the Patriots USA, Inc.* v. *Hochul*, 17 F.4th 266, 287 (2d Cir. 2021) (concluding that it is appropriate to consider "aggregate data about transmission risks" in determining whether medical and religious exemptions from health care worker vaccine mandates were comparable), cert. denied sub nom. *Dr. A.* v. *Hochul*, U.S. , 142 S. Ct. 2569, 213 L. Ed. 2d 1126 (2022).

Finally, contrary to the plaintiffs' assertions, P.A. 21-6 does not treat noncompliant students more favorably than those who object to vaccines on religious grounds. Both groups are required to be vaccinated. The fact that there may be students who are noncompliant does not render P.A. 21-6 underinclusive. The plaintiffs' argument in this regard would merit consideration if we were to conclude that the act fails the two prongs under *Smith*. Only then would the state be required to prove that the act serves a compelling state interest and employs the least restrictive means available for doing so. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, supra, 508 U.S. 546. Because we conclude that the act satisfies *Smith*'s two prongs, however, we need not address this argument.

Spillane *v.* Lamont

on them. It is for these reasons that the acting commissioner [of public health] testified that '[h]igh vaccination rates protect not only vaccinated children, but also those who cannot be or have not been vaccinated.' . . . In contrast, exempting religious objectors from vaccination would only detract from the [s]tate's interest in promoting public health by increasing the risk of transmission of [vaccine preventable] diseases among vaccinated and unvaccinated students alike.

"This analysis is bolstered by the public health data and expert testimony the General Assembly considered before adopting the [a]ct, some of which are summarized in a document [the] plaintiffs appended to the complaint. . . . The material attached to the complaint is sparse, but, as we noted . . . we may take judicial notice of the facts and analysis in the legislative record, including the testimony of the acting commissioner [of public health] and comments from numerous medical authorities. These materials show there is no question that there is a difference in magnitude between the number of religious and medical exemptions that Connecticut families claimed prior to the [a]ct's adoption. In school years 2018–2019 and 2019–2020, more than ten times as many kindergartners claimed religious exemptions compared to medical exemptions. The legislative history, moreover, contains numerous indications that significant numbers of religiously exempt students attend the same schools. Against this backdrop, the [l]egislature reasonably judged that the risk of an outbreak of disease was acute, even if not necessarily imminent, and that continuing to permit religious exemptions, the [s]tate's only kind of nonmedical exemption, to multiply would increase that risk." (Citations omitted; emphasis omitted.) Id., 153–54.

Having concluded that P.A. 21-6 is a neutral law of general applicability, the only question that remains is whether it is rationally related to a legitimate govern-

Spillane *v.* Lamont

mental interest. For any claim analyzed under rational basis review, the subject law will not be overturned "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Vance* v. *Bradley*, 440 U.S. 93, 97, 99 S. Ct. 939, 59 L. Ed. 2d 171 (1979); see also *Heller v. Doe*, 509 U.S. 312, 321, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (under rational basis review, "[a] statute is presumed constitutional . . . and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis [that] might support it . . . whether or not the basis has a foundation in the record" (citations omitted; internal quotation marks omitted)). In *We the Patriots USA, Inc.*, the Second Circuit concluded that P.A. 21-6 passes rational basis review because the state's interest in protecting public health is indisputably a compelling governmental interest and because the "[a]ct's repeal of the religious exemption is rationally related to that interest because it seeks to maximize the number of students in Connecticut who are vaccinated against [vaccine preventable] diseases. . . . The [a]ct's legacy provision is [also] rationally related because it accommodates religious believers who are already in school without extending that accommodation to younger children. (Citations omitted.) *We the Patriots USA, Inc.* v. *Connecticut Office of Early Childhood Development*, supra, 76 F.4th 156. The plaintiffs in the present case do not contend otherwise.[12]

_____

[12] The plaintiffs argue instead that, if P.A. 21-6 is a neutral and generally applicable law, strict scrutiny should still apply because their free exercise claim is "connected with the right of parents to direct the education of their children" recognized in *Wisconsin* v. *Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), and *Pierce* v. *Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), making it the sort of "hybrid rights" claim that the United States Supreme Court, in *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 872, stated in dictum could be subject to a higher level of scrutiny. The plaintiffs do not address in their appellate brief how P.A. 21-6 interferes with their rights as parents to direct the

Spillane *v.* Lamont

Finally, we note that, in *Jacobson* v. *Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905), the United States Supreme Court rejected equal protection and due process challenges to a Massachusetts compulsory vaccination law. Id., 38–39. The court later observed that "*Jacobson* . . . settled that it is within the police power of a [s]tate to provide for compulsory vaccination." *Zucht* v. *King*, 260 U.S. 174, 176, 43 S. Ct. 24, 67 L. Ed. 194 (1922). Although *Jacobson* was decided before the free exercise clause was held to apply to the states; see *Cantwell* v. *Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); the United States Supreme Court has since stated, albeit in dictum, that

education of their children. We therefore decline to address this argument. See, e.g., *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 804–805, 256 A.3d 655 (2021) (courts do not reach inadequately briefed claims). We note, however, that the "hybrid rights" theory has never been applied by the United States Supreme Court and has been rejected outright by many of the federal courts of appeals, including the Second Circuit. See *Leebaert* v. *Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) ("at least until the [United States] Supreme Court holds that legal standards under the [f]ree [e]xercise [c]lause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard' to evaluate hybrid claims" (internal quotation marks omitted)); see also *Fulton* v. *Philadelphia*, supra, 593 U.S. 599 (Alito, J., concurring in the judgment) ("It is hard to see the justification for this curious doctrine. The idea seems to be that if two independently insufficient constitutional claims join forces they may merge into a single valid hybrid claim, but surely the rule cannot be that asserting two invalid claims, no matter how weak, is always enough."); *Pleasant View Baptist Church* v. *Beshear*, 838 Fed. Appx. 936, 940 (6th Cir. 2020) (Donald, J., concurring) ("we have not only expressed skepticism regarding whether this passage from *Smith* formally created a '[hybrid rights]' doctrine, we have outright rejected it"); *Brown* v. *Pittsburgh*, 586 F.3d 263, 284 n.24 (3d Cir. 2009) ("Relying on dict[um] in *Smith*, some litigants pressing [f]ree [e]xercise claims have presented a 'hybrid rights' theory . . . . Like many of our sister courts of appeals, we have not endorsed this theory . . . ." (Citations omitted.)); *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001) (rejecting hybrid claim argument that "the combination of two untenable claims equals a tenable one"), cert. denied sub nom. *Henderson* v. *Mainella*, 535 U.S. 986, 122 S. Ct. 1537, 152 L. Ed. 2d 464 (2002); *Kissinger* v. *Board of Trustees of The Ohio State University of Veterinary Medicine*, 5 F.3d 177, 180 (6th Cir. 1993) (referring to hybrid rights theory as "completely illogical").

a parent "cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." (Footnote omitted.) *Prince* v. *Massachusetts*, 321 U.S. 158, 166–67, 64 S. Ct. 438, 88 L. Ed. 645 (1944). "That dictum is consonant with [the United States Supreme Court's] and [the Second Circuit's] precedents holding that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (Internal quotation marks omitted.) *Phillips* v. *New York*, 775 F.3d 538, 543 (2d. Cir.), cert. denied, 577 U.S. 822, 136 S. Ct. 104, 193 L. Ed. 2d 37 (2015); see id. (following reasoning of *Jacobson* and *Prince*, and concluding that "New York could constitutionally require that all children be vaccinated in order to attend public school" and that New York vaccination law "goes beyond what the [c]onstitution requires by allowing an exemption for parents with genuine and sincere religious beliefs").

In light of the foregoing, we conclude that the plaintiffs' free exercise challenge fails as a matter of law on this record, and, therefore, it is barred by sovereign immunity.

2

Equal Protection Claim

The defendants next claim that the trial court incorrectly denied their motions to dismiss the plaintiffs' claim that P.A. 21-6 violates their right to the equal protection of the law by treating students who are unvaccinated for religious reasons differently from students who are unvaccinated for medical reasons. The plaintiffs advance the same arguments in support of their equal protection claim as they did with respect to

Spillane *v.* Lamont

their free exercise claim, albeit in considerably truncated form. These arguments survive rational basis review under the equal protection clause for the same reason they survive it under the free exercise clause. See, e.g., *Locke* v. *Davey*, 540 U.S. 712, 720 n.3, 124 S. Ct. 1307, 158 L. Ed. 2d 1 (2004) ("[The respondent] also argues that the [e]qual [p]rotection [c]lause protects against discrimination on the basis of religion. Because we hold . . . that the program is not a violation of the [f]ree [e]xercise [c]lause, however, we apply [rational basis] scrutiny to his equal protection claims. *Johnson* v. *Robison*, [415 U.S. 361, 375 n.14, 94 S. Ct. 1160, 39 L. Ed. 2d 389] (1974); see also *McDaniel* v. *Paty*, [435 U.S. 618, 98 S. Ct. 1322, 55 L. Ed. 2d 593 (1978)] (reviewing religious discrimination claim under the [f]ree [e]xercise [c]lause)"). Accordingly, the plaintiffs' equal protection claim is also barred by sovereign immunity.

3

Right to Education Claim

Finally, the defendants argue that the trial court incorrectly denied their motions to dismiss the plaintiffs' claim that P.A. 21-6 violates their right to a free public school education under article eighth, § 1, of the state constitution. The defendants assert that the plaintiffs' claim is foreclosed as a matter of law by this court's precedent interpreting the right guaranteed by article eighth, § 1, and recognizing school vaccination requirements to be a proper exercise of the state's police power. The plaintiffs' counter that P.A. 21-6 violates their right to education because it forces them to make a difficult choice between the free exercise of their sincerely held religious beliefs and their fundamental right to education. We agree with the defendants that the plaintiffs' claim is foreclosed as a matter of law.

Article eighth, § 1, of the Connecticut constitution provides: "There shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." This language "imposes an affirmative constitutional obligation on the legislature to provide a substantially equal educational opportunity for all public schoolchildren"; *Sheff* v. *O'Neill*, 238 Conn. 1, 23, 678 A.2d 1267 (1996); that is "suitable to give them the opportunity to be responsible citizens able to participate fully in democratic institutions, such as jury service and voting." *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 314, 990 A.2d 206 (2010); see id., 315–17 (establishing qualitative standards for constitutionally adequate education under article eighth, § 1, with "recognition of the political branches' constitutional responsibilities, and indeed, greater expertise, with respect to the implementation of specific educational policies pursuant to the education clause").

In *Horton* v. *Meskill*, supra, 172 Conn. 615, this court held, in the context of statewide disparities in the financing of public school education, that "elementary and secondary education is a fundamental right, [and] that pupils in the public schools are entitled to the equal enjoyment of that right . . . ." Id., 648–49. Although we stated in *Horton* that the constitutional right to education is "so basic and fundamental that any infringement of that right must be strictly scrutinized"; id., 646; we subsequently rejected the conclusion that "strict scrutiny must be the test for any and all governmental regulations affecting public school education." *Campbell* v. *Board of Education*, 193 Conn. 93, 105, 475 A.2d 289 (1984). Indeed, we have held repeatedly that decisions relating to educational policy and its implementation are "quintessentially legislative in nature" and are not to be second-guessed by the courts. *Connecticut*

Spillane *v.* Lamont

*Coalition for Justice in Education Funding, Inc.* v. *Rell*, 327 Conn. 650, 658, 176 A.3d 28 (2018); see also *Bissell* v. *Davison*, 65 Conn. 183, 190–92, 32 A. 348 (1894) (upholding vaccine mandate under state and federal constitutions and observing that "the question [of] what terms, conditions, and restrictions will best [serve] the end sought in the establishment and maintenance of public schools . . . is a question solely for the legislature and not for the courts").

We conclude that P.A. 21-6 does not impinge on the plaintiffs' state constitutional right to education. In *Campbell* v. *Board of Education*, supra, 193 Conn. 93, we held that an educational policy "[that] is neither disciplinary . . . nor an infringement of equal educational opportunity, does not jeopardize *any* fundamental rights under our state constitution." (Citations omitted; emphasis added.) Id., 104. P.A. 21-6 is neither disciplinary nor infringes the plaintiffs' right to access a substantially equal educational opportunity, which is the substance of the right secured under article eighth, § 1. Rather, P.A. 21-6 merely imposes a reasonable vaccine requirement as a condition of enrolling in public school. In *Bissell* v. *Davison*, supra, 65 Conn. 183, we upheld a similar vaccine requirement against claims that it violated the equal protection and due process clauses of the state and federal constitutions. Id., 192. The plaintiff in *Bissell* argued that "the statute conferring the power to require vaccination[s] as a condition of admittance to, or attendance at, the public schools, violate[d] [his constitutional rights because it] allow[ed] . . . the privileges of the common schools to those who believe in vaccination, [while denying] it to those who do not . . . ." Id., 190.

Although the right to education was not yet enshrined in our state constitution when *Bissell* was decided, we recognized therein that the duty to provide a free public school education had been "assumed by the [s]tate; not

only because the education of [children] is a matter of great public utility, but also and chiefly because it is one of great public necessity for the protection and welfare of the [s]tate itself. In the performance of this duty, the [s]tate maintains and supports, at great expense, and with an ever watchful solicitude, public schools throughout its territory, and secures to its [children] the privilege of attendance therein. . . . This privilege is granted, and is to be enjoyed [on] such terms and under such reasonable conditions and restrictions as the [lawmaking] power, within constitutional limits, may see fit to impose; and, within those limits, the question [of] what terms, conditions, and restrictions will best [serve] the end sought in the establishment and maintenance of public schools . . . is a question solely for the legislature and not for the courts. The statute in question authorizes the [school] committee to impose [a] vaccination [requirement] as one of those conditions. It does not authorize or compel compulsory vaccination; it simply requires vaccination[s] as one of the conditions of . . . attending the public school. Its object is to promote the usefulness and efficiency of the schools by caring for the health of the scholars. . . . The statute is essentially a police regulation . . . .'' Id., 191.

''In the case at bar the [vaccination requirement] is made to operate impartially [on] all children alike; it affects all in the same way; and reasonable provision is made for providing free vaccination[s] [when] necessary. It is a reasonable exercise of the power to require vaccination[s] . . . . [W]e think that in a case like [this] . . . touching the terms and conditions of attendance at the public schools, the question of the reasonableness . . . of such a requirement, is one exclusively for the legislature.

''The question before us is not whether the legislature ought to have passed such a law; it is simply whether it had the power to pass it.

Spillane *v.* Lamont

"In no proper sense can this statute be said to contravene the provisions of . . . our [s]tate [c]onstitution, as claimed by the plaintiff. It may operate to exclude his son from school, but if so, it will be because of his failure to comply with what the legislature regards, wisely or unwisely, as a reasonable requirement enacted in good faith to promote the public welfare.

"Nor in any proper sense can the statute be said to deprive the plaintiff of any right without due process of law, or to deny to him the equal protection of the law." Id., 192.

Although our state constitution now imposes an affirmative obligation on the state to provide adequate educational opportunities to its school-age children, we remain of the view that school vaccine requirements are a rational exercise of legislative judgment reasonably related to the state's interest in caring for the health and safety of its students, and that, "within the limits of rationality, the legislature's efforts to tackle the problems [of education] should be entitled to respect." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, supra, 327 Conn. 667–68.

We find no merit in the plaintiffs' argument that P.A. 21-6 presents them with a "Hobson's choice" between the free exercise of their religious beliefs and their fundamental right to education. Although some who are opposed to vaccination on religious grounds may opt not to take advantage of the educational opportunities provided to them under article eighth, § 1, of the state constitution, this does not mean that P.A. 21-6 deprives them of those opportunities. See *We the Patriots USA, Inc.* v. *Hochul*, 17 F.4th 266, 293–94 (2d Cir. 2021) ("[a]lthough individuals who object to receiving the vaccines on religious grounds have a hard choice to make, they do have a choice"), cert. denied sub nom.

Spillane *v.* Lamont

*Dr. A.* v. *Hochul*, U.S. , 142 S. Ct. 2569, 213 L. Ed. 2d 1126 (2022). Accordingly, and for the other reasons previously set forth in this opinion, we conclude that the plaintiffs' challenge to P.A. 21-6 under article eighth, § 1, fails as a matter of law, and, therefore, it is barred by sovereign immunity.

II

We next turn to the question of whether the plaintiffs' free exercise of religion claim under § 52-571b satisfies the first exception to sovereign immunity: "when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity . . . ." (Citations omitted; internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, supra, 293 Conn. 349.

The defendants raise two challenges to the trial court's determination that this exception was satisfied. First, they contend that the text of § 52-571b does not encompass legislation and, therefore, could not waive immunity for the plaintiffs' challenge to P.A. 21-6. Second, they argue that it would violate settled legal principles to apply § 52-571b to the subsequently enacted P.A. 21-6. Specifically, the defendants contend that this application would violate the constitutionally based principle that one legislature cannot control the powers of a succeeding legislature, as well as the precept that subsequent legislation will be presumed to repeal earlier legislation to the extent that both conflict. We disagree.

Our analysis begins with the statutory text. Section 52-571b provides in relevant part: "(a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

Spillane *v.* Lamont

"(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.

"(c) A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the state or any political subdivision of the state.

\* \* \*

"(f) For the purposes of this section, 'state or any political subdivision of the state' includes any agency, board, commission, department, officer or employee of the state or any political subdivision of the state . . . ."

We note that the two components of the state's burden under subsection (b) of the statute—compelling governmental interest and least restrictive means—constitute a codification of the constitutional standard for strict scrutiny. See, e.g., *Kennedy* v. *Bremerton School District*, 597 U.S. 507, 525, 142 S. Ct. 2407, 213 L. Ed. 2d 755 (2022).

A

The defendants' textual argument implicitly concedes what is plainly apparent from the text of § 52-571b, that subsection (c) provides a waiver of sovereign immunity when, as in the present case, a plaintiff claims a violation of the right to the free exercise of religion under the state constitution and seeks equitable relief. Cf. *Davila* v. *Gladden*, 777 F.3d 1198, 1208-1209 (11th Cir.) (citing uncontroversial proposition that similar language in federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq., waived sovereign immunity for claims seeking injunctive relief), cert.

Spillane *v.* Lamont

denied, 577 U.S. 820, 136 S. Ct. 78, 193 L. Ed. 2d 32 (2015). The defendants' position is that this waiver does not extend to challenges to legislation because (1) strict statutory construction applies, and (2) the text of § 52-571b does not plainly encompass legislation.[13] We are not persuaded.

The issue of whether the legislature has waived the state's sovereign immunity under the statute is a matter of statutory interpretation. See, e.g., *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, 293 Conn. 382, 386, 978 A.2d 49 (2009). This inquiry implicates certain general rules of construction, as well as specific rules applicable to the particular inquiry. One such specific rule is that "statutes in derogation of sovereign immunity should be strictly construed. . . . [When] there is any doubt about their meaning or intent they are given the effect [that] makes the least rather than the most change in sovereign immunity." (Internal quotation marks omitted.) *Feliciano* v. *State*, 336 Conn. 669, 675, 249 A.3d 340 (2020). This rule, under which our inquiry begins and ends with the statute's text, applies when the question is *whether* a statute provides a waiver of immunity, either expressly or by necessary

---

[13] The defendants contend that "[t]he *plain text* of § 52-571b makes clear that the statute does *not* apply to legislation." (Emphasis added.) We note that the attorney general responded to a legislative request for a formal legal opinion regarding "the constitutionality of eliminating the religious exemption for required immunizations" for school enrollment. (Internal quotation marks omitted.) Opinions, Conn. Atty. Gen. No. 2019-01 (May 6, 2019) p. 1. Although the request was phrased specifically in terms of constitutional impediments, the attorney general's opinion also treated § 52-571b as controlling and expressed confidence that such legislative action would meet the statute's compelling interest standard. See id., p. 4–5. The opinion was issued in response to an earlier legislative effort to repeal the religious exemption; see House Bill No. 5044, 2020 Sess.; but was specifically referenced in Senate and House floor debates in 2021. See 64 S. Proc., Pt. 1, 2021 Sess., pp. 786, 794, remarks of Senators Kevin C. Kelly and Martin Looney; 64 H.R. Proc., Pt. 2, 2021 Sess., pp. 1065–66, 1453, remarks of Representative Jonathan Steinberg.

implication. See *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, supra, 389–91 and n.6. When, however, the question is the *scope* of a waiver of immunity, our inquiry is not similarly constrained. See id., 391 n.6. In such cases, we are guided by General Statutes § 1-2z, which permits review of extratextual sources to resolve textual ambiguities. See id.; see also *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 453, 54 A.3d 1005 (2012) (legislative history).

The issue in the present case involves the scope of the waiver provided in § 52-571b. Starting with the text, we find nothing in the language of § 52-571b that expressly excludes a challenge to legislation; nor do we find unambiguous evidence of exclusion by implication. The textual evidence implies no apparent exceptions, but, instead, defines the waiver to include the conduct of "*any* agency, board, commission, department, officer or employee of the state or any political subdivision of the state . . . ." (Emphasis added.) General Statutes § 52-571b (f). These are the very governmental actors most typically charged with the enforcement of legislation and manifestly include the defendants in the present case.[14] Legislation reasonably may be characterized as setting forth "rule[s] of general applicability . . . ." General Statutes § 52-571b (a). To the extent that the defendants argue that a statute is different from a rule, the case cited in the defendants' brief as support for this proposition acknowledged that the term "rule" "could . . . encompass a statute" but concluded that it would not when read in conjunction with other language referring to administrative acts. *Wadler* v. *Bio-Rad Laboratories, Inc.*, 916 F.3d 1176, 1186 (9th Cir.

---

[14] Even if the defendants are correct that the officials named by the plaintiffs as defendants are not the ones who would enforce the vaccine mandate, an issue that was not resolved by the trial court, that pleading error would not be relevant to the question before us, namely, whether § 52-571b waives sovereign immunity for free exercise challenges to legislation.

Spillane *v.* Lamont

2019). Nonetheless, although the broad language of § 52-571b seems to suggest that it naturally would extend to legislation, we cannot say that it does so unambiguously given the legislature's use of the term "rule."

We therefore consider extratextual sources. As this court previously has explained after examining the statute's legislative history, "§ 52-571b was enacted in response to the United States Supreme Court's decision in *Employment Division, Dept. of Human Resources* v. *Smith*, supra, 494 U.S. 885, in which the court held that a generally applicable prohibition against socially harmful conduct does not violate the free exercise clause, regardless of whether the law burdens religious exercise. . . . [T]he purpose of § 52-571b was to restore the balancing standard, articulated by the United States Supreme Court in *Sherbert* v. *Verner*, [374 U.S. 398, 403, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963)], under which a law that burdens religious exercise must be justified by a compelling governmental interest." (Citations omitted.) *Cambodian Buddhist Society of Connecticut, Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381, 423–24, 941 A.2d 868 (2008). *Smith* and *Sherbert*, notably, both involved constitutional challenges to statutes. See id., 402–404 (discussing facts in both cases). Proponents of the bill ultimately enacted as § 52-571b made clear that the intention was to provide a judicial remedy for *any* free exercise claim that could have been made prior to *Smith*. See, e.g., 36 S. Proc., Pt. 8, 1993 Sess., p. 2785, remarks of Senator George C. Jepson ("to be absolutely clear . . . this bill does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the [United States] Supreme Court's free exercise . . . jurisprudence under the compelling interest test prior to . . . *Smith*"). This extratextual evidence confirms what the text of the statute suggests—the legislature intended

Spillane *v.* Lamont

for the waiver of immunity in § 52-571b to extend to free exercise challenges to the enforcement of legislation.

B

We next consider the defendants' arguments as to why, regardless of the legislature's clear intent to waive sovereign immunity in § 52-571b, certain doctrines bar application of the statute to P.A. 21-6. The defendants point to two doctrinal rules with constitutional underpinnings. The first rule is the "centuries-old concept that one legislature may not bind the legislative authority of its successors." *United States* v. *Winstar Corp.*, 518 U.S. 839, 872, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996); accord *Patterson* v. *Dempsey*, 152 Conn. 431, 439, 207 A.2d 739 (1965). The second rule is that legislative enactments are presumed to repeal earlier inconsistent ones, to the extent that they are irreconcilably in conflict. See, e.g., *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 553, 46 A.3d 112 (2012); *Dugas* v. *Lumbermens Mutual Casualty Co.*, 217 Conn. 631, 641, 587 A.2d 415 (1991). The defendants claim that these principles would be violated by applying § 52-571b to P.A. 21-6 because § 52-571b prescribes a higher standard for the state to meet (compelling interest) to pass judicial scrutiny than the standard that applies to a free exercise constitutional challenge under *Smith*. They argue that, if the validity of P.A. 21-6 is determined by the earlier enacted § 52-571b, P.A. 21-6 could be struck down by a court, even if the legislation was constitutional under *Smith*, which, in turn, would violate these doctrinal rules. We disagree that either of the rules cited by the defendants are violated by the application of § 52-571b to P.A. 21-6.

The text of § 52-571b does not purport to limit the authority of subsequent legislatures to repeal the statute or to modify its terms. Cf. *Patterson* v. *Dempsey*, supra, 152 Conn. 438–39 (statute prohibiting future legislatures from including general legislation in appropriations bills

violated rule that "[o]ne legislature cannot control the exercise of the powers of a succeeding legislature" (internal quotation marks omitted)). The legislative history in fact reflects that this issue was considered. The sponsor of the legislation acknowledged that the statutory standard could be changed by a subsequent legislature to a rational basis test, as long as that lower standard of scrutiny did not conflict with the constitutional standard.[15] See 36 H.R. Proc., Pt. 14, 1993 Sess., pp. 4940-41, remarks of Representative Richard D. Tulisano.

The question thus becomes whether § 10-204 (a), as amended by P.A. 21-6, expressly or by necessary, or fair, implication conflicts with § 52-571b. See *Lockhart* v. *United States*, 546 U.S. 142, 148, 126 S. Ct. 699, 163 L. Ed. 2d 557 (2005) (Scalia, J., concurring) (citing cases using "necessary implication" or "fair implication" (emphasis omitted; internal quotation marks omitted)). This answer is dictated by application of settled principles of statutory construction. One such principle is that there is a "powerful presumption against implied repeals." *Lockhart* v. *United States*, supra, 149 (Scalia,

---

[15] The following exchange occurred during legislative debate:

"[Representative Dale W. Radcliffe]: In introducing the bill Representative Tulisano referred to the [s]tate [c]onstitution, the [s]tate constitutional provisions. This is a statute. We're in effect adopting [the] compelling interest test as a statutory standard. . . . [G]iven the decision in *Smith* and the fact that no similar case has been decided under the [s]tate [c]onstitution, if this [l]egislature or a subsequent [l]egislature does desire, might we establish a rational basis test to replace this compelling interest test in [the] statute? . . .

"[Representative Richard D. Tulisano]: . . . I believe we could. However . . . the [s]tate Supreme Court may very well say, could very well say, that despite what we did, that it is the compelling state interest test under [the Connecticut constitution] because our [c]onstitution in some people's [belief] . . . has greater protections than that given under the federal, and so [the court] could very well interpret our [c]onstitution to have always had that despite what we say, and we cannot minimize what has already been granted by the people of the [s]tate of Connecticut." 36 H.R. Proc., Pt. 14, 1993 Sess., pp. 4940–41.

J., concurring). This presumption can be overcome only if the "two statutes are in irreconcilable conflict, or [when] the [later enacted provision] covers the whole subject of the earlier one and is clearly intended as a substitute." (Internal quotation marks omitted.) *Branch* v. *Smith*, 538 U.S. 254, 273, 123 S. Ct. 1429, 155 L. Ed. 2d 407 (2003) (opinion announcing judgment); accord *Lockhart* v. *United States*, supra, 149 (Scalia, J., concurring).

P.A. 21-6 does not expressly conflict with § 52-571b. Section 10-204a, as amended by P.A. 21-6, dictates only that certain immunizations are a condition of school enrollment and enumerates limited exemptions from those requirements. P.A. 21-6 does not expressly address the availability of judicial review or the standard that would guide such review. It also does not exempt its provisions from the scope of § 52-571b. Nor is there text in P.A. 21-6 that necessarily, or fairly, implies that the act provides immunity from suit or requires courts to apply a lower level of scrutiny than that required should § 52-571b apply. As the defendants argue, it is possible that P.A. 21-6 would be subject to and satisfy the lower level of scrutiny set forth in *Smith*—hence, meeting the federal constitutional standard—and, yet, fail to satisfy the strict scrutiny standard required under § 52-571b. We are not persuaded, however, that this possibility gives rise to an irreconcilable conflict between the statutes.

Although the law permits us to presume that the legislature was aware of the compelling interest standard in § 52-571b when it enacted P.A. 21-6, in the present case, there is evidence indicating awareness of that standard. Attorney General William Tong provided a formal opinion to the Majority Leader of the House of Representatives regarding the constitutionality of eliminating the religious exemption from the vaccine mandate. See Opinions, Conn. Atty. Gen. No. 2019-01

Spillane *v.* Lamont

(May 6, 2019). Tong not only expressed confidence that there was no constitutional concern; id., pp. 1, 7; he also explained that § 52-571b applied, and he expressed similar confidence that the statute presented no necessary conflict with such a repeal. See id., p. 5. During debate in the Senate on the bill enacted as P.A. 21-6, the bill's sponsor similarly asserted that the bill was "in accordance with settled law," specifically quoting the critical language in § 52-571b and citing Attorney General Tong's opinion.[16] See 64 S. Proc., Pt. 1, 2021 Sess., p. 794, remarks of Senator Martin Looney. No one suggested that the bill should be amended to expressly exclude it from operation of the statute, e.g., by adding "notwithstanding § 52-571b."

Accordingly, nothing in the legislative history indicates that the legislature considered P.A. 21-6 to be inconsistent with the requirements of § 52-571b. To the contrary, there is considerable evidence that the legislature considered § 52-571b to be applicable to P.A. 21-

---

[16] Senator Martin Looney asserted that mandatory vaccination requirements comported with the federal constitution and then stated: "And what we are doing here is in accordance, both with our best traditions of protecting public health and safety, and also in accordance with settled law. [Section] 52-571b provides that in the state of Connecticut, any state or any political subdivision cannot burden the free exercise of religion under article [first], [§] 3 of the [s]tate [c]onstitution, even if that burden results from a rule of general applicability *except* [*when*] *the burden is in furtherance of a compelling state interest. And it is the least restrictive means of furthering that compelling state interest.*

"*And that is what we are asserting here.* There is a compelling state interest here that demands regulation that we would be irresponsible not to undertake. Attorney General Tong's opinion was mentioned earlier, he just two years ago . . . asserted that repealing or suspending the religious exemption does not create any necessary conflict with [§ 52-571b] in the first instance and says that combatting the spread of dangerous infectious diseases, particularly among children who congregate in schools where the danger of the spread of such diseases is particularly high ground. That it is the state's paramount duty to seek to ensure [the] public safety has repeatedly been found to constitute a compelling state interest . . . ." 64 S. Proc., Pt. 1, 2021 Sess., p. 794.

6. We therefore conclude that the text, the legislative history, and the circumstances surrounding the enactment of P.A. 21-6 demonstrate that application of § 52-571b to the act does not violate either doctrinal rule relied on by the defendants.

The judgment is reversed in part and the case is remanded with direction to dismiss counts two through six of the complaint and for further proceedings consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

———————————————